IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DANTE BURTON, | No. 4:24-CV-00761 |
| Plaintiff, | (Chief Judge Brann) |
| v. | |
| C.O. CRAWFORD, *et al.*, | |
| Defendants. | |

## MEMORANDUM OPINION

### DECEMBER 17, 2025

Plaintiff Dante Burton filed the instant *pro se* Section 1983[1] action in 2024, alleging excessive force by multiple prison officials at SCI Dallas.  His case concerns a use-of-force incident that occurred on April 20, 2022, from which he suffered significant physical injuries.  Presently pending is Defendants' motion for summary judgment under Federal Rule of Civil Procedure 56.  Genuine disputes of material facts remain in this case, so the Court will deny Defendants' Rule 56 motion.

---

[1] 42 U.S.C. § 1983.  Section 1983 creates a private cause of action to redress constitutional wrongs committed by state officials.  The statute is not a source of substantive rights; it serves as a mechanism for vindicating rights otherwise protected by federal law.  *See Gonzaga Univ. v. Doe*, 536 U.S. 273, 284-85 (2002).

I.  **FACTUAL BACKGROUND**[2]

At the time of the April 20, 2022 use-of-force incident underlying this lawsuit, Burton was incarcerated at SCI Dallas.[3] Just prior to the incident, Burton was being seen by Unit Manager Grohowski for an informal resolution hearing.[4] Corrections officers Crawford and Cebrick were present and acting as witnesses at this hearing.[5]

According to Burton, Crawford became "disrespectful" during the hearing and started using profanity toward him.[6] Burton attests that he asked Crawford to stop, and Crawford responded by inviting him to "get into a physical altercation," *i.e.*, to "fight."[7] Burton "accepted [Crawford's] offer," and the two began trading punches.[8] Cebrick and Grohowski intervened and "took [Burton] to the ground."[9]

---

[2] Local Rule of Court 56.1 requires that a motion for summary judgment be supported "by a separate, short, and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried." LOCAL RULE OF COURT 56.1. A party opposing a motion for summary judgment must file a separate statement of material facts responding to the numbered paragraphs set forth in the moving party's statement and identifying genuine issues to be tried. *Id.* Defendants filed their statement of material facts, (Doc. 62), and Burton properly responded to this statement, (Doc. 69). To the extent that any facts are undisputed, the Court will cite directly to the parties' Rule 56.1 statements.
[3] Doc. 62 ¶ 1.
[4] *Id.* ¶ 2.
[5] *Id.*
[6] Doc. 68-1 ¶ 2.
[7] *Id.* ¶ 4.
[8] *Id.* ¶¶ 5-6.
[9] *Id.* ¶ 6; Doc. 62 ¶ 4 (second). Defendants' statement of material facts contains two paragraphs that are numbered "4." *See* Doc. 62 at p. 2.

According to Defendants, while on the ground, Burton was "instructed to give up his hands" so that he could be handcuffed, but Burton refused.[10]  Cebrick then administered "a 1 second burst of OC spray" to gain compliance.[11]  Corrections officers Zaborney and Konchnik "arrived later" and "assisted in securing" Burton.[12]  Lieutenant Gardzalla then arrived and Burton was "escorted to medical."[13]

Burton describes the incident much differently.  He attests that, once he was taken to the ground, Crawford sat on his legs and Grohowski put his knee into his neck and held Burton's left arm against his body.[14]  During this time, Burton avers that he was no longer resisting.[15]  According to Burton, his right arm was pinned underneath him and he was "never ordered" to give up his hands.[16]  Crawford and Cebrick then began to punch Burton in his "head, face[,] and body," "mercilessly beating on" him for "no reason at all."[17]  Burton attests that he began to "go in and out of consciousness" due to the blows from Crawford and Cebrick.[18]  Crawford then had Cebrick spray Burton with OC spray "for no reason."[19]  When Gardzalla

---

[10]  Doc. 62 ¶ 5.
[11]  *Id.* ¶ 6.
[12]  *Id.* ¶ 7.
[13]  *Id.* ¶ 8.
[14]  Doc. 68-1 ¶ 7.
[15]  *Id.*
[16]  *Id.* ¶ 8.
[17]  *Id.* ¶¶ 9-10.
[18]  *Id.* ¶ 11.
[19]  *Id.* ¶ 12.

arrived and saw that Burton had punched Crawford (causing Crawford to bleed), Gardzalla instructed Crawford to "get his licks in."[20]  Crawford then twisted Burton's left arm in a way that caused extreme pain and broke his elbow.[21]

Burton recalls that he was then handcuffed and walked off the unit by Zaborney and Konchnik.[22]  According to Burton, Gardzalla instructed Zaborney and Konchnik to "get [him] down."[23]  Burton attests that Zaborney and Konchnik pushed him forward onto his knees with his head to the ground, hyperextending his arms all the way behind him, causing extreme pain, and severely injuring his right shoulder.[24]  He avers that he was walked in this manner to the medical department, and when he arrived he informed medical staff that his arm was broken.[25]

In Burton's medical records, the SCI Dallas medical provider who assessed him in the holding cell after the incident noted that Burton was crying, his "left shoulder" was "up higher than his right," he refused to raise his left arm over his head or behind his back during a range-of-motion examination, and that he informed the provider that his "left arm is broken."[26]  Burton was given a prescription for ibuprofen and X-rays were ordered.[27]

---

[20]  *Id.* ¶¶ 13-14.
[21]  *Id.* ¶ 15.
[22]  *Id.* ¶ 16.
[23]  *Id.* ¶ 17.
[24]  *Id.* ¶ 18.
[25]  *Id.* ¶¶ 19-20.
[26]  Doc. 68-2 at 12.
[27]  *Id.* at 13.

Burton was then immediately transferred to SCI Mahanoy.[28] He was not taken to a hospital at that time.[29] At SCI Mahanoy, Burton avers that he "informed medical" that SCI Dallas officers had broken his arm, punched him in the face and head, and injured his shoulder.[30] Burton eventually received X-rays several weeks later, and a May 9, 2022 progress note from SCI Mahanoy indicates that one X-ray showed a fracture of the coronoid process of his left ulna.[31] Burton was given a sling for his arm and a consultation with orthopedics was ordered.[32] On October 11, 2022, Burton received an MRI of his right shoulder at Holy Spirit Hospital, which demonstrated a "complete tear of the ligament of the shoulder," as well as a deformity of the proximal humerus "due to a previous healed fracture."[33]

Burton initially filed the instant civil rights lawsuit in the Court of Common Pleas of Luzerne County, Pennsylvania.[34] Defendants removed the case to this Court.[35] Defendants now move for summary judgment on Burton's Eighth Amendment excessive force claim and seek dismissal of his state-law tort claims based on state statutory sovereign immunity.[36] That Rule 56 motion is fully briefed and ripe for disposition.

---

[28] Doc. 68-1 ¶ 23; Doc. 62 ¶ 19.
[29] Doc. 62 ¶ 19.
[30] Doc. 68-2 ¶ 26 (verified amended complaint).
[31] Doc. 68-2 at 16.
[32] *Id.* at 17.
[33] *Id.* at 18-19.
[34] *See* Doc. 1-2.
[35] *See generally* Doc. 1.
[36] *See generally* Doc. 60.

## II.   STANDARD OF REVIEW

"One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses."[37]  Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[38]  Material facts are those "that could alter the outcome" of the litigation, and "disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct."[39]

At the Rule 56 stage, the Court's function is not to "weigh the evidence and determine the truth of the matter" but rather "to determine whether there is a genuine issue for trial."[40]  The Court must view the facts and evidence presented "in the light most favorable to the non-moving party" and must "draw all reasonable inferences in that party's favor."[41]  This evidence, however, must be adequate—as a matter of law—to sustain a judgment in favor of the nonmoving party on the claim or claims at issue.[42]  A "scintilla of evidence" supporting the nonmovant's position is insufficient; "there must be evidence on which the jury

---

[37] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).
[38] Fed. R. Civ. P. 56(a).
[39] *EBC, Inc. v. Clark Bldg. Sys., Inc.*, 618 F.3d 253, 262 (3d Cir. 2010) (quoting *Clark v. Modern Grp. Ltd.*, 9 F.3d 321, 326 (3d Cir. 1993)).
[40] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).
[41] *Thomas v. Cumberland County*, 749 F.3d 217, 222 (3d Cir. 2014).
[42] *Liberty Lobby*, 477 U.S. at 250-57; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-89 (1986).

6

could reasonably find for the [nonmovant]."[43] Succinctly stated, summary judgment is "put up or shut up time" for the nonmoving party.[44]

## III. DISCUSSION

Defendants assert four arguments in their Rule 56 motion: (1) they are entitled to summary judgment on the merits of Burton's Eighth Amendment excessive force claims; (2) they are entitled to sovereign immunity on Burton's state-law assault and battery claims; (3) they are shielded from liability on Burton's federal claims by qualified immunity; and (4) Burton failed to exhaust administrative remedies. The Court will address each argument, but in a different order than presented by Defendants.

### A. Administrative Exhaustion

The Prison Litigation Reform Act of 1995 (PLRA)[45] requires prisoners to exhaust available administrative remedies before suing prison officials for alleged constitutional violations.[46] Proper exhaustion is mandatory, even if the inmate is seeking relief—like monetary damages—that cannot be granted by the administrative system.[47] Failure to properly exhaust generally results in the claim

---

[43] *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 192 (3d Cir. 2015) (quoting *Liberty Lobby*, 477 U.S. at 252) (alteration in original).
[44] *Daubert v. NRA Grp., LLC*, 861 F.3d 382, 391 (3d Cir. 2017) (quoting *Berkeley Inv. Grp. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006)).
[45] 42 U.S.C. § 1997e *et seq*.
[46] *See* 42 U.S.C. § 1997e(a); *Ross v. Blake*, 578 U.S. 632, 639, 642 (2016) (explaining that only "available" remedies must be exhausted).
[47] *Woodford v. Ngo*, 548 U.S. 81, 85 (2006).

being procedurally defaulted and unreviewable.[48]  The exhaustion process a prisoner must follow is governed by the contours of the prison grievance system in effect where the inmate is incarcerated.[49]

Pennsylvania's Department of Corrections (DOC) employs a three-step grievance process that must be completed to properly exhaust administrative remedies in most cases.[50]  If informal resolution attempts do not solve the problem, the first step is to file a written grievance (using form DC-804, Part 1) with the Facility Grievance Coordinator within 15 working days after "the event upon which the claim is based."[51]  An adverse decision by the grievance coordinator must be appealed to the Facility Manager within 15 working days of the initial-review response or rejection.[52]  Finally, an adverse decision by the Facility Manager must be appealed to "Final Review" with the Secretary's Office of Inmate Grievances and Appeals (SOIGA), and again must be submitted within 15 working days of the date of the Facility Manager's decision.[53]

Defendants assert that Burton only filed one grievance concerning the at-issue events, grievance number 980198.  They contend that this grievance concerns

---

[48] *See Spruill v. Gillis*, 372 F.3d 218, 230 (3d Cir. 2004).
[49] *Jones v. Bock*, 549 U.S. 199, 218 (2007); *see also Woodford*, 548 U.S. at 90-91.
[50] *See Downey v. Pa. Dep't of Corr.*, 968 F.3d 299, 305-06 & n.4 (3d Cir. 2020); COMMONWEALTH OF PA., DEP'T OF CORR., INMATE GRIEVANCE SYS., Policy No. DC-ADM 804 (May 1, 2015) (hereinafter "DC-ADM 804").
[51] DC-ADM 804 § 1(A)(3)-(5), (8).
[52] *Id.* § 2(A)(1).
[53] *Id.* § 2(B)(1).

his medical treatment and does not implicate a claim of excessive force or battery.[54]  Therefore, Defendants conclude, Burton procedurally defaulted his excessive force claims.

There is, however, a genuine dispute of material fact regarding whether grievance number 980198 is the only relevant grievance Burton filed.  Burton attests in his sworn declaration that on or around April 24, 2022, he attempted to file a grievance about the SCI Dallas corrections officers' use of excessive force.[55]  He avers that he put the grievance in an envelope addressed to the SCI Dallas grievance officer, placed the envelope in his cell door, an officer "took it out to be mailed," but that he "never got a response from that grievance."[56]  Burton thus contends that he availed himself of the remedies that were available to him, which is the most he could do.

At the Rule 56 stage, Burton's sworn declaration is sufficient to create an issue of material fact regarding whether he exhausted administrative remedies.[57]  Burton attests that he attempted to mail a grievance about the excessive force incident to the SCI Dallas grievance coordinator.  He avers, under oath, that he put the grievance in an envelope for mailing, placed it in his cell door for pickup by

---

[54] See Doc. 61 at 13-15.
[55] See Doc. 68-1 ¶ 27.
[56] Id. ¶¶ 27-28.
[57] See Lauria v. Lieb, 152 F.4th 549, 553 (3d Cir. 2025) (quoting Lupyan v. Corinthian Colleges Inc., 761 F.3d 314, 320 (3d Cir. 2014)).

prison staff, and that a corrections officer retrieved the mail from his cell door. Whether the corrections officer properly processed and mailed that grievance, or whether SCI Dallas grievance officials received and processed the grievance was beyond Burton's control. When viewing the facts in a light most favorable to Burton, his affidavit is sufficient to defeat Defendants' Rule 56 contention that he failed to exhaust administrative remedies.[58]

### B. Merits of Eighth Amendment Excessive Force Claim

In a Section 1983 claim for excessive force, the "pivotal inquiry" is whether "force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."[59] The factors analyzed when making this inquiry include: "(1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of the injury inflicted; (4) the extent of the threat to the safety of staff and inmates, as reasonably perceived by responsible officials on the basis of facts known to them; and (5) any efforts made to temper the severity of the forceful response."[60] The

---

[58] *See Paladino v. Newsome*, 885 F.3d 203, 209-10 (3d Cir. 2018) (finding that prisoner's sworn deposition testimony set forth "specific facts that reveal a genuine issue of material fact" regarding whether he exhausted his excessive force claim, and noting that "a single, non-conclusory affidavit or witness's testimony, when based on personal knowledge and directed at a material issue, is sufficient to defeat summary judgment" (quoting *Lupyan*, 761 F.3d at 320)).

[59] *Ricks v. Shover*, 891 F.3d 468, 480 (3d Cir. 2018) (quoting *Smith v. Mensinger*, 293 F.3d 641, 649 (3d Cir. 2002)).

[60] *Id.* (quoting *Smith*, 293 F.3d at 649).

10

Eighth Amendment, however, "does not protect an inmate against an objectively *de minimis* use of force."[61]

Defendants contend that, because Burton attacked Crawford, the use of force utilized to subdue him was reasonable and necessary and did not violate the Eighth Amendment. When viewing the facts in a light most favorable to Burton, the Court cannot agree. Under Burton's sworn version of events, only the first of the five factors implicates a reasonable use of force.

As to the first factor, there was clearly a need for the application of force in the instant case. Burton admits that he "accepted" Crawford's invitation to physically fight and that the two were trading punches. This type of behavior plainly calls for physical intervention by prison officials.

The second factor weighs in favor of excessive force. According to Burton, three officers were present and had him subdued on the ground, with one arm controlled by an officer and the other pinned beneath his body and an officer sitting on his legs. Two officers then "mercilessly" assaulted Burton, repeatedly punching him in the head, face, and body. He was also pepper sprayed. Under Burton's version of events, neither the OC spray nor the punches were necessary because he was completely subdued and no longer resisting. Burton additionally attests that Crawford was encouraged "to get his licks in" and in fact did so by

---

[61] *Smith*, 293 F.3d at 649 (citation omitted).

breaking Burton's left elbow. Moreover, after Burton was handcuffed, he avers that additional, unnecessary force was applied during his transport to medical for the sole purpose of injuring him or causing him pain, and in fact resulted in significant right shoulder injuries. These facts clearly cut in favor of excessive force.

The extent of the injury inflicted likewise favors Burton's allegation of excessive force. Despite Defendants' attempt to downplay Burton's injuries,[62] he was severely injured during the use-of-force event. Not only was his left elbow fractured, but he additionally suffered a complete ligament tear in his right shoulder. It is also possible that Burton's right upper arm was broken during the incident, as the October 2022 MRI demonstrated a healed previous fracture of the right proximal humerus. Furthermore, Burton attests that he suffered headaches and dizziness for eight months after the incident due to being repeatedly punched in the head. This third factor weighs heavily in Burton's favor.

As to the fourth factor, it too cuts against Defendants' reasonableness argument. Initially, use of force was necessary due to the threat posed to corrections officers present. However, once Burton was subdued, the continued use of force (*i.e.*, punching Burton repeatedly and breaking his elbow) reflects an unnecessary and excessive amount of force, as the threat to the corrections officers

---

[62] *See* Doc. 61 at 6.

had already been neutralized. Moreover, Defendants admit that numerous corrections officers were on the scene and no other inmates were involved, at one point representing at least a five-to-one ratio of officers to inmate. Additionally, the altercation occurred in the officers' station,[63] an area that is separated from the prisoners' cells. Finally, under Burton's version of events, excessive force was also used after he was handcuffed and led off the housing unit, resulting in serious shoulder injuries. This fourth factor, therefore, plainly cuts in Burton's favor.

The fifth and final factor also implicates excessive force. Under Burton's version of events, it does not appear that there was any effort to temper the severity of the forceful response. Rather, while Burton was restrained on the ground, Crawford was encouraged to *increase* the severity of his force, which Crawford did by breaking Burton's left elbow. Additionally, Konchnik and Zaborney were encouraged to inflict pain on Burton during transport to medical, and they too applied force for apparently no other reason than to cause Burton pain or to injure him.

When viewing the facts in a light most favorable to Burton, it is clear that summary judgment on the excessive force claims must be denied. Four of the five factors militate in favor of a finding of excessive force, and some of them tilt quite

---

[63] *See* Doc. 68-1 ¶ 1.

heavily in Burton's favor.  Accordingly, Defendants' Rule 56 argument concerning the merits of Burton's Eighth Amendment claim fails.

### C. Qualified Immunity

Qualified immunity shields state officials from money damages unless a plaintiff establishes that (1) "the official violated a statutory or constitutional right," and (2) "the right was 'clearly established' at the time of the challenged conduct."[64]  The Court has "discretion to decide which of the two prongs of qualified-immunity analysis to tackle first."[65]

"A Government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would [have understood] that what he is doing violates that right.'"[66]  "[C]learly established rights are derived either from binding Supreme Court and Third Circuit precedent or from a 'robust consensus of cases of persuasive authority in the Courts of Appeals.'"[67]  Clearly established law may not be defined "at a high level of generality."[68]  Rather, "[t]he dispositive question is whether the violative nature of *particular* conduct is clearly established."[69]

---

[64] *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (citation omitted).
[65] *Id.*
[66] *Id.* at 741 (alterations in original) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).
[67] *Bland v. City of Newark*, 900 F.3d 77, 84 (3d Cir. 2018) (quoting *Fields v. City of Philadelphia*, 862 F.3d 353, 361 (3d Cir. 2017)).
[68] *Mullenix v. Luna*, 577 U.S. 7, 12 (2015).
[69] *Id.* (internal quotation marks omitted) (quoting *al-Kidd*, 563 U.S. at 742).

Finally, "[w]here a defendant asserts a qualified immunity defense in a motion for summary judgment, the plaintiff bears the initial burden of showing that the defendant's conduct violated some clearly established statutory or constitutional right."[70]

Defendants appear to argue that both prongs support qualified immunity for their conduct, *i.e.*, that there was no constitutional violation and that—assuming for the sake of argument there was—the violative nature of the conduct at issue was not clearly established. The Court need only address the second half of this argument, as the detailed analysis above shows that there is a genuine dispute of material fact as to whether Defendants violated the Eighth Amendment by using excessive force during the April 20, 2022 incident.

Defendants define the right at issue as "bringing [an] inmate to the ground and deploying one second worth of OC spray" to "subdue an inmate who attacked a correction[s] officer" and who "refuse[d] to comply with the orders to show his hands."[71] The problem with this framing is that it applies a version of facts that is highly disputed and favors the moving party, which is inappropriate at summary judgment.

When viewing the facts in a light most favorable to Burton, the qualified immunity question becomes whether it was clearly established that continuing to

---

[70] *Sherwood v. Mulvihill*, 113 F.3d 396, 399 (3d Cir. 1997) (citations omitted).
[71] Doc. 61 at 11.

15

punch, physically assault, and intentionally inflict pain and serious injury on a prisoner who is restrained and no longer resisting violates the constitution. The Court has little difficulty finding that any reasonable prison official in 2022 would know that such conduct violates the Eighth Amendment.[72]

Burton's case is on all fours with *Giles v. Kearney*, 571 F.3d 318 (3d Cir. 2009). There, a material dispute of fact existed as to whether Giles—a state prisoner—had ceased resisting and was subdued at the point when corrections officers kicked him in his ribs and punched him in the head, fracturing his rib and puncturing his lung.[73] As the United States Court of Appeals for the Third Circuit held when reversing the district court's finding of qualified immunity at summary judgment, "No reasonable officer could agree that striking and kicking a subdued, nonresisting inmate in the side, with force enough to cause a broken rib and collapsed lung, was reasonable or necessary under established law."[74]

---

[72] *See Whitley v. Albers*, 475 U.S. 312, 320-21 (1986) ("Where a prison security measure is undertaken to resolve a disturbance, such as occurred in this case, that indisputably poses significant risks to the safety of inmates and prison staff, we think the question whether the measure taken inflicted unnecessary and wanton pain and suffering ultimately turns on 'whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.'"); *Giles v. Kearney*, 571 F.3d 318, 326 (3d Cir. 2009) (finding that inmate's allegations of being "kicked in the ribs and punched in the head while restrained on the ground, after he ceased to resist," rose to level of excessive force); *Giles*, 571 F.3d at 326 ("[A]t the time of the incident in 2001, it was established that an officer may not kick or otherwise use gratuitous force against an inmate who has been subdued." (citation omitted)); *Brooks v. Kyler*, 204 F.3d 102, 107 (3d Cir. 2000) (finding that three corrections officers assaulting a handcuffed, restrained prisoner by "repeatedly punching him in the head, stomping on his back and neck, slamming him into a wall, [and] choking him" would implicate excessive force).

[73] *Giles*, 571 F.3d at 327.

[74] *Id.*

The same conclusion applies here. No reasonable corrections officer could believe that continuing to punch a subdued, non-resisting inmate in the head and face and then breaking that inmate's left elbow and tearing a ligament in his shoulder (and possibly breaking his right arm as well) was reasonable or necessary under established law. Under the facts and evidence proffered by Burton, qualified immunity does not apply.[75]

### D. State Statutory Sovereign Immunity

Commonwealth parties acting within the scope of their employment generally are immune from suit except when immunity is explicitly waived.[76] Pennsylvania's General Assembly has carved out certain limited exceptions from its grant of sovereign immunity to Commonwealth actors.[77] Section 8522(b) of Title 42 of the Pennsylvania Consolidated Statutes provides ten narrow categories[78] where the state has waived its sovereign immunity for claims involving negligent

---

[75] *See Curley v. Klem*, 298 F.3d 271, 278 (3d Cir. 2002) ("Just as the granting of summary judgment is inappropriate when a genuine issue exists as to any material fact, a decision on qualified immunity will be premature when there are unresolved disputes of historical fact relevant to the immunity analysis.").

[76] *See* 1 PA. CONS. STAT. § 2310; 42 PA. CONS. STAT. §§ 8521, 8522(a).

[77] *See generally* 42 PA. CONS. STAT. §§ 8521, 8522.

[78] The ten exceptions set forth in 42 PA. CONST. STAT. § 8522(b) concern: (1) vehicle liability; (2) medical-professional liability; (3) care, custody or control of personal property; (4) Commonwealth real estate, highways and sidewalks; (5) potholes and other dangerous conditions; (6) care, custody or control of animals; (7) liquor store sales; (8) National Guard activities; (9) toxoids and vaccines; and (10) sexual abuse.

17

conduct by Commonwealth parties.[79] This state statutory immunity applies to both negligent and intentional torts committed by Commonwealth actors.[80]

Because statutory immunity is an affirmative defense, the defendant bears the burden of establishing that his conduct was within the scope of employment.[81] Whether a state official's conduct is within the scope of employment is determined by considering if (1) "it is the kind he is employed to perform," (2) it occurs "substantially within the authorized time and space limits," and (3) "it is actuated, at least in part, by a purpose to serve" the employer.[82]

Defendants contend that because they were acting within the scope of employment when they subdued, pepper sprayed, and handcuffed Burton, they are statutorily immune from the intentional torts of assault and battery. Defendants, however, once again rely on a factual backdrop that is starkly different from the version of events provided by Burton, who attests that Defendants' conduct went far beyond restoring discipline and instead involved a brutal assault on an already-restrained prisoner. Pennsylvania courts have repeatedly held that "an assault committed by an employee upon another for personal reasons or in an outrageous manner is not actuated by an intent to perform the business of the employer and, as

---

[79] *See id.* § 8522(a), (b).
[80] *See La Frankie v. Miklich*, 618 A.2d 1145, 1149 (Pa. Commw. Ct. 1992).
[81] *Justice v. Lombardo*, 208 A.3d 1057, 1068 (Pa. 2019).
[82] *Id.* at 1067 (citing RESTATEMENT (SECOND) OF AGENCY § 228(1) (1958)).

such, is not within the scope of employment."[83] Commonwealth courts have additionally held that "[a] high degree of 'outrageousness' can take an employee's actions 'outside the scope' of his or her employment."[84]

Here, under Burton's proffered evidence, Defendants' actions of beating a subdued, nonresisting prisoner, breaking that prisoner's left arm, and intentionally hyperextending his arms such that a ligament completely tears in his shoulder (and possibly results in a fracture of his upper right arm as well) are the type of outrageous, assaultive actions that move an employee's conduct outside the scope of employment. Consequently, state statutory sovereign immunity does not shield Defendants from Burton's state-law claims of assault and battery.

In sum, none of Defendants' Rule 56 arguments is persuasive. The Court will therefore deny Defendants' motion for summary judgment in full.

---

[83] *Costa v. Roxborough Mem'l Hosp.*, 708 A.2d 490, 493 (Pa. Super. Ct. 1998); *Fitzgerald v. McCutcheon*, 410 A.2d 1270, 1272 (Pa. Super. Ct. 1979) ("Where, however, the employee commits an act encompassing the use of force which is excessive and so dangerous as to be totally without responsibility or reason, the employer is not responsible as a matter of law. If an assault is committed for personal reasons or in an outrageous manner, it is not actuated by an intent of performing the business of the employer and is not done within the scope of employment.").

[84] *Zion v. Nassan*, 283 F.R.D. 247, 267 (W.D. Pa. 2012) (citing *Potter Title & Trust Co. v. Knox*, 113 A.2d 549, 551 (Pa. 1955)); *Lunn v. Boyd*, 169 A.2d 103, 104-05 (Pa. 1961) ("If the act of assault, although a means of accomplishing an authorized result, is done for personal reasons or in an outrageous manner, it is not done within the scope of the employment. The fact that the act was done in an outrageous manner is indicative that the employee is not actuated by any intent of performing the business of his employer, but rather, that it is done solely through his own private malice.").

## IV. CONCLUSION

Based on the foregoing, the Court will deny Defendants' motion for summary judgment under Federal Rule of Civil Procedure 56 in all respects. An appropriate Order follows.

BY THE COURT:

*s/ Matthew W. Brann*
Matthew W. Brann
Chief United States District Judge
